**HUDSON, James R., Savage, Donald**

v.

**ROBINSON, William B., Commissioner Bureau of Correction; Hewitt, Lowell D., Superintendent; Norris, Richard, Librarian, Huntingdon; Marks, Ronald J.**

Appeal of James R. HUDSON,
in 81–1479.

Appeal of William B. ROBINSON, et al., in 81–1480.

Nos. 81–1479, 81–1480.

United States Court of Appeals,
Third Circuit.

Argued Oct. 14, 1981.

Decided May 18, 1982.

---

Frederick M. Stanczak (argued), Jonathan E. Butterfield, Susquehanna Legal Services, Williamsport, Pa., for James R. Hudson.

Francis R. Filipi (argued), Gregory R. Neuhauser, Deputy Attys. Gen., Leroy S. Zimmerman, Atty. Gen., Harrisburg, Pa., for William B. Robinson, et al.

Before HUNTER, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

These appeals have been taken from the January 13, 1981 grant of injunctive relief in favor of the plaintiff, James R. Hudson, an inmate at the State Correctional Institution at Huntingdon, Pennsylvania ("Huntingdon"). Hudson brought this action pursuant to 42 U.S.C. § 1983 (1976) to contest the adequacy of the law library facilities at Huntingdon. During the pendency of the action, corrective measures were taken by Huntingdon's superintendent to remedy some of the alleged deficiencies. The district court ruled that these actions were insufficient to protect plaintiff's constitutional right of access to the courts, enjoined defendants from reverting to prior practices and specified certain corrective measures to be taken by defendants. Defendants complied with those measures and appealed. Hudson cross-appealed, alleging that certain of the corrective measures are insufficient to remedy the alleged defects. We held these appeals under advisement pending our decision in *Kershner v. Mazurkiewicz*, 670 F.2d 440 (3d Cir. 1982). We will now reverse.

## FACTS

Huntingdon's prison facilities include a law library. Each inmate at Huntingdon is assigned one night per week during which he may use the library, which is open on weeknights between 6:45 p. m. and 8:45 p. m. The library is also open from 1:00 p. m. to 4:00 p. m. on weekday afternoons. Anyone who wishes to gain access to the library at any other time must obtain permission from the librarian, Richard Norris, by submitting a request slip. Inmates who wish to work together and are not scheduled for the same library hours must also make requests. The court below found that efforts were made to accommodate all reasonable requests. Appendix at 150. Hudson, for example, was scheduled for additional library hours on forty-four days during a two-year period beginning March 15, 1979. Appendix at 151.

At the time this action was commenced, the law library was closed to inmates (except for limited use such as photocopying) whenever Norris was absent from the institution. The library was closed for eighteen days during the year which commenced April 13, 1979. The library was also closed on portions of other days and on weekends. Appendix at 152. On June 10, 1980, Huntingdon adopted a policy of providing a substitute librarian for the afternoons on which Norris was absent, appendix at 151, thereby insuring that the library would be open for its scheduled hours.

The law library is located adjacent to a "learning center" provided for inmates by the institution. Prior to 1980, inmates who were going to classes had to pass through the library in order to get from their cells to the learning center. The area was subsequently remodeled to allow inmates to go directly to class from their cells without passing through the library. This action substantially reduced distractions in the library, and the noise level has been reduced by fifty percent. Appendix at 153.

Notary services, formerly available one day each week, are now available every weeknight. Appendix at 155. The prison employs two law library aides who assist their fellow inmates with questions regarding legal research. Appendix at 154. There are typewriters in the library available for use by the inmates. Appendix at 153. Free writing material such as paper is not always available to prisoners; however, paper is stocked in the commissary and sold at no more than five percent above cost. Appendix at 148. A photocopy machine is available; copies cost six cents. Appendix at 154.

## PROCEDURAL HISTORY

The plaintiff, Hudson, does legal research for fellow inmates.[1] He claims that he has been unconstitutionally deprived of access to the courts, and makes the following allegations:

---

1. Hudson claims to be acting on behalf of himself and the inmates for whom he does legal research. For reasons set forth *infra*, we do not reach the question of whether Hudson can properly assert the claims of these inmates.

a. The noise in the library severely impedes concentration on legal research and writing.

b. Notary services are not always available.

c. The library is open at inconvenient times and is closed when the librarian is on vacation or sick.

d. Supplies such as pens and paper are not available free of cost.

e. Inmates who wish to work together on legal matters are sometimes unable to do so.

Plaintiff does not complain that the library itself is inadequate, or that the legal material provided is insufficient in any way. Rather, plaintiff focuses on the ancillary items listed above and contends that the combined effect of the alleged deficiencies serves to limit access to the courts in an unconstitutional manner.

The district court held that meaningful access to the courts had been denied to plaintiff and that the changes effected by defendants did not moot the case. In addition to the changes made by defendants, the court ordered the following:

a. That defendants be enjoined from reverting to the practice of directing inmate traffic from the cell blocks to the learning center through the law library.

b. That all indigent inmates be provided with free paper and a pen.[2]

c. That notary services be available each weekday (except for holidays).

d. That the library be open from 1:00 p. m. to 4:00 p. m. and from 6:30 p. m. to 8:30 p. m. five days a week.[3]

e. That "no talking" signs be posted and a "whispering zone" be established.

f. That the prison inmate handbook be altered to include information as to how an inmate could request time to work in the law library with another inmate.

**DISCUSSION**

*Mootness*

We must first decide whether the changes wrought by defendants render moot either this entire case or any of the individual issues raised by plaintiff. The district court held that no part of the case was rendered moot by the voluntary changes effectuated by defendants prior to the entry of judgment. We disagree.

■ As the district court correctly noted, a question is moot when it no longer presents a "live" controversy. If a defendant has discontinued challenged activities (as this defendant has), the case is moot if there is no reasonable expectation that the wrong will be repeated. *United States v. W. T. Grant Company*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Cobb v. Aytch*, 472 F.Supp. 908, 920 (E.D.Pa.1979), *aff'd in relevant part*, 643 F.2d 946 (3d Cir. 1981).

■ The court's decision to enjoin defendants from reverting to the practice of routing traffic through the library was rendered superfluous by the actions of the defendants. There is no reason to believe that the institution would incur the substantial expense required to undo the remodeling in the learning center and revert to its former policy. Furthermore, defendants would gain nothing from such an action. In any event, the district court specifically found that defendants have no intention of reversing any of the changes in policy or physical layout concerning the operation of the law library at Huntingdon. Appendix at 155. In light of this finding, we hold that this issue is moot.

■ Similarly, the requirement that the institution set out in its handbook the procedure whereby inmates might request permission to work together was unnecessary. The institution tried to grant all reasonable requests. There is no reason to believe that the institution will change its

---

**2.** The district court defined indigency as the failure to have twenty dollars in one's prison account at any time during the thirty days prior to the request for supplies. Appendix at 166.

**3.** By Order dated January 27, 1981, the evening hours were changed to 6:50 p. m. to 8:50 p. m. Appendix at 170.

policy. That the district court may believe that its recommendation will improve the administration of the prison is not sufficient to justify its action. The federal courts should be loathe to intervene in the administration of state prisons unless there are constitutional violations. Where there is no constitutional violation and no reason to believe that a prison will alter its procedures in a manner that is violative of the Constitution, a federal district court should not question the wisdom of a state's prison policies. *Bell v. Wolfish*, 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979). *See Cobb v. Aytch*, 472 F.Supp. at 922–24.[4]

The remaining issues (*i.e.*, free pens and paper, the notarial services, hours of access and the noise problems) have not been mooted by the changes which the institution implemented. We thus proceed to the merits on those issues.

*The Merits*

As we have determined that this case has not been mooted in its entirety, we must proceed to the question of whether the complaint has alleged an unconstitutional denial of access to the courts. *See Kershner*, 670 F.2d at 444. We rule that plaintiff has failed to show that his access to the courts has been unconstitu'ionally abridged or denied.

Appellees, much like appellants in *Kershner*, rely heavily on *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). The issue in *Bounds* was "whether States must protect the right of prisoners to access to the courts by providing them with law libraries or alternative sources of legal knowledge." 430 U.S. at 817, 97 S.Ct. at 1492. In *Kershner* we stated: "Pads, pens, pencils and photocopy machines are neither 'law libraries' nor 'alternative sources of legal knowledge.'" 670 F.2d at 444.

It is possible that a combination of several factors might, taken together, lead to a finding that a prisoner has been denied access to the courts, where no one of the factors, taken alone, would do so. However, it must first be shown that the proceeding involves access to the courts, *Kershner*, 670 F.2d at 444, and that some actual injury, that is, an "instance in which an inmate was actually denied access to the courts," *id.*, has occurred.[5] That burden has not been met here. The only "injury" suffered by plaintiff was his being required on one occasion to wait ten days to have a document notarized. As a result, he submitted the document later than he would have liked but prior to the date it was due. This does not satisfy the actual injury requirement.

We need not decide whether Hudson can assert the claims of other inmates. Appellee admits that this question is relevant only to the issue of inmates being informed as to the procedure for coordinating their library times and activities. We have held this issue to be moot. Even if it were not, there is no evidence before us that any inmates were denied access to the courts. The failure to meet that threshold issue renders any discussion of standing unnecessary.

4. Federal courts should, of course, avoid intervening in the administration of state institutions whenever possible, and must give proper regard to the discretion of corrections officials. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Such officials are entitled to

> wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and in the absence of substantial evidence in the record to indicate that the officials have ex-

> aggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'

*Bell v. Wolfish*, 441 U.S. 520, 547–8, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979), *quoting Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

5. While a prison must normally make notary services available to its inmates, *Bounds v. Smith*, 430 U.S. 817, 824, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977), it does not necessarily follow that the failure to provide such services constitutes a denial of access to the courts. Pursuant to 28 U.S.C. § 1746, documents submitted to the courts need not be notarized.

As plaintiff has failed to show a denial of access to the courts, we need not reach the question whether the district court's standard for indigency was proper. As in *Kershner*, we reserve judgment on that issue.

For the foregoing reasons, the decision of the district court will be reversed.